UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| **DANIELLE M. REZYKOWSKI,** | : | **Chapter 7** |
| | : | |
| Debtor. | : | **Bky. No. 11-19726  ELF** |
| | : | |
| | : | |
| **ROBIN NAKONETSCHNY,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **Adv. No. 12-0309  ELF** |
| **DANIELLE M. REZYKOWSKI,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

# O P I N I O N

## I.  INTRODUCTION

In 2008, Debtor Danielle Rezykowski ("the Debtor") purchased a retail apparel store known as Circles, LLC ("Circles") from Robin Nakonetschny ("the Plaintiff").  The Debtor signed a promissory note for most of the purchase price.  The note was secured by the assets of the business.  In approximately late 2010 and early 2011, the Debtor conducted a "blow out" sale and closed the business.  The Debtor opened a separate account for the proceeds from the blow out sale, but later took the money for herself, ostensibly for her own back wages.  Shortly thereafter, the Debtor filed for individual chapter 7 bankruptcy relief.

The Plaintiff instituted this adversary proceeding against the Debtor requesting a determination that the Debtor's use of the proceeds from the blow out sale gave rise to a debt for

1

willful and malicious injury that is excepted from discharge under 11 U.S.C. §523(a)(6).

The crux of this dispute is whether the Debtor's payment to herself caused a "willful and malicious" injury to the Plaintiff; i.e., whether the Debtor's conduct was wrongful and whether she purposefully inflicted the injury or acted in such a manner that she was substantially certain that injury would result.  See In re Singer, 2010 WL 3732944, at *5 (D.N.J. Sept. 17, 2010) (citing In re Conte, 33 F.3d 303, 305 (3d Cir. 1994)).

Based on the evidence presented at trial, I find, by a preponderance of the evidence, that: the Debtor's appropriation of the sale proceeds was wrongful; she caused a willful and malicious injury to the Plaintiff's property rights; and the debt to the Plaintiff arising therefrom is nondischargeable under §523(a)(6).

## II.  PROCEDURAL HISTORY

The Debtor filed her chapter 7 bankruptcy petition on December 23, 2011.  The §341 meeting of creditors was set for January 25, 2012.  Thus, the deadline for filing objections to discharge or dischargeability was March 26, 2012.  See Fed. R. Bankr. P. 4007(c).[1]

The Plaintiff filed a complaint in the main bankruptcy case entitled "Third Party Complaint" on March 26, 2012.  (Ex. P-2).  On April 13, 2013, the Plaintiff initiated this adversary proceeding by filing the same complaint ("the Complaint").  (Ex. D-5).

In the preamble to the Complaint, the Plaintiff asserted an objection to the Debtor's discharge under §727(a) in the Complaint.  (Ex. D-5).  In the numbered counts of her Complaint,

---

[1]    March 25, 2012 technically was the deadline, but the date fell on a weekend; therefore, objections were extended to the following business day.  See Fed. R. Bankr. P. 9006(a)(1)(c).

however, the Plaintiff cited only to §523(a)(2) and (a)(6).  (Id.).

The Debtor filed a motion to dismiss the Complaint, listing numerous deficiencies, including legal insufficiency and lack of service of process.  The parties settled the motion by allowing the Plaintiff leave to file an amended complaint.  The Plaintiff filed an amended complaint ("the Amended Complaint") on July 12, 2012, (Doc. #8), asserting claims under 11 U.S.C. §727(a)(2), (a)(3) and (a)(5).  The Debtor filed her Answer to the Amended Complaint on June 18, 2012.  (Doc. # 10).

Trial of this adversary proceeding was held on February 1, 2013.  At the conclusion of the trial, the Plaintiff abandoned her objections to the Debtor's discharge under §727(a).  (N.T. 10:53:41).[2]  The parties agreed, however, to permit the Plaintiff to amend her Amended Complaint orally to set forth a claim for nondischargeability under 11 U.S.C. §523(a)(6).  (N.T. 10:50:00).  As a result, the only claim remaining is the Plaintiff's request the subject debt be excepted from discharge pursuant to §523(a)(6).  (See Doc. # 26).

Post-trial briefing was completed on March 7, 2013.


### III.  FINDINGS OF FACT

#### The Business Sale Transaction

1.   In August 2005, Circles was organized as a limited liability company. (Ex. P-1 at 42).

2.   Circles operated a retail children's clothing store at 5 South Main Street, Doylestown, Pennsylvania.  (Id. at 14).

---

[2]      The notes of testimony were not transcribed.  References to the trial testimony are to the time of day in the digital recording of the hearing.

3

3.  Sometime prior to April 2008, the Plaintiff entered into negotiations for the sale of Circles and specified business assets to the Debtor.

4.  On April 16, 2008, the parties closed on the sale of Circles.  The sale transaction was documented by several contracts, which included, inter alia, a business purchase agreement, promissory note, and security agreement.  (See Ex. P-1).

5.  The Business Purchase Agreement ("the BPA") provided for the sale of Circles by the Plaintiff to the Debtor for a purchase price of $58,244.67.  (See id. at 13-26).  Attached as exhibits to the BPA were a list of fixtures, assets and the inventory included in the sale.  (Id. at 22).

6.  As part of the recitals, the BPA stated that the Debtor "wishes to operate a retail children's clothing store and desires to acquire the business."  (Id. at 14).

7.  At the closing, the Debtor paid a down payment of $1,000.00 and executed a "Secured Promissory Note" ("the Note") in favor of the Plaintiff, in the principal amount of $57,244.67, with an interest rate of nine (9) percent.  (Id. at 28-31).

8.  The principal amount of the Note was to be repaid over sixty (60) months, beginning June 15, 2008.  The initial six (6) monthly payments under the Note were at a reduced rate, with the balance of the payments at $1,293.21 per month.  (Id. at 28).

9.  Under the Note, the failure to make any payment of principal or interest within ten (10) days of the due date constituted a default.  Upon default, the holder had the right to accelerate the Note and declare all amounts under the Note immediately due.  (Id.).

10. The Note included a confession of judgment clause which allowed the Plaintiff to confess judgment in the event of the Debtor's default.  (Id.).

4

11. In connection with Note, the Debtor executed a "Security Agreement" ("the Security Agreement") for the repayment of the Note.  (Id. at 32-37).

12. In the Security Agreement, the Debtor granted the Plaintiff a security interest in the business assets of the retail children's clothing store, including the inventory ("the Collateral").  (See id. at 32, 34).[3]

13. The Security Agreement defined "Collateral" to include, inter alia:

> substitutions, replacements, additions, accessions, proceeds, products to or of any of the foregoing, including, but not limited to . . .  any and all Accounts, General Intangibles, Negotiable Collateral, Inventory . . . money, deposits, accounts or other tangible or intangible property resulting from the sale or other disposition of the Accounts, General Intangibles, Negotiable Collateral, Inventory . . . or any portion thereof or interest therein and the proceeds thereof.

(Id. at 33).

14. The Security Agreement incorporated the definition of "proceeds" under the Pennsylvania Uniform Commercial Code ("the Pa. UCC"),[4] and further defined it to include, "whatever is received when Collateral or Proceeds is sold, exchanged, collected or otherwise disposed of, whether cash or non-cash." (Ex. P-1 at 34).

---

[3]    The Recital to the security agreement states the parties' intent to grant the Plaintiff a security interest in "the assets of the Buyer."  While this may have created an ambiguity insofar as "the Buyer" in the transaction was the Debtor while the assets subject to the security interest were owned by Circles, LLC, there is no doubt that the parties intended to grant the Plaintiff a security interest in the Circles' assets.  See Ex. P-1, at 15 (BPA ¶3.01) (stating that the promissory note would be secured by "all . . .  goods and chattels used in connection with said business; together with property or accessories acquired as replacement or substitutions of  . . . said Collateral"); see also id. at 19 (BPA ¶11.01) ("In the event of any conflict between a provision of this Agreement any Exhibit or Schedule . . . this Business Purchase Agreement shall control").

[4]    "Proceeds" under the Pa. UCC includes: "Whatever is acquired upon the sale, lease, license, exchange or other disposition of collateral."  13 Pa.C.S. § 9102.

15.   The terms of the Security Agreement provided without qualification, that "without the prior

      written consent of the [Plaintiff], [the Debtor] shall not sell, lease or otherwise dispose of

      the Collateral."  (Id.).

16.   The Security Agreement did not include a provision requiring the Debtor to segregate or

      otherwise account for the proceeds of the sale of inventory.

17.   The Debtor read the Security Agreement before executing it and testified that she

      understood it.  (N.T. 9:17:50 - 9:19:28).

18.   The Plaintiff filed a UCC Financing Statement on June 16, 2008 in Pennsylvania as notice

      of her security interest in Circles' assets.  (Ex. P-1 at 46-47).

19.   The Plaintiff attached to the UCC Financing Statement, an exhibit containing a detailed

      listing of the collateral that was subject to the security agreement.  That listing was almost

      identical to the description of the collateral in the Security Agreement.  (Id. at 47).


**Operation of Circles and Its Closure Through the Liquidation Sale**

20.   The Debtor worked at Circles' retail shop full-time after she bought the business.  When she

      first purchased Circles, the Debtor drew a salary of approximately $500.00 per week.  (N.T.

      9:50:25).

21.   Notwithstanding the unqualified requirement in the Security Agreement, the Debtor did not

      obtain written permission from the Plaintiff prior to selling inventory in the ordinary course

      of business.  Nevertheless, the Plaintiff acquiesced to the sale of inventory in the ordinary

course without prior notice.[5]

22.     The Debtor ceased paying herself a salary from Circles sometime in 2009.  (N.T. 9:49:50).

To meet her personal financial expenses, the Debtor was employed at a restaurant until it

closed approximately one (1) year prior to filing her chapter 7 bankruptcy petition.  (N.T.

9:56:43, 10:20:05).[6]

23.     At some point, presumably in 2010, the Debtor decided to cease Circles' business

operations because she was not generating enough money to support herself.  (N.T.

10:19:00).

24.     The Debtor conducted a liquidation sale ("the Liquidation Sale") prior to closing the

business.  (N.T. 9:21:02, 10:19:00).

25.     The Liquidation Sale took place over several months beginning in late 2010.[7]

26.     The Debtor opened an account at Third Federal Bank ("the Third Federal Account"), and as

the Liquidation Sale progressed, periodically deposited the money generated from the

Liquidation Sale into the account.

---

[5]     I infer these facts from the Debtor's testimony that she operated Circles as a going concern for approximately two (2) years after she acquired the business and the absence of any evidence that: (a) the Debtor undertook the laborious task of communicating with the Plaintiff to obtain written permission prior to each retail sale of merchandise or (b) the Plaintiff declared a default based on the sale of the inventory.

[6]     For some period during her unemployment, the Debtor collected unemployment insurance benefits.  (N.T. 10:20:05).

[7]     The Debtor's testimony was conflicting as to when the Liquidation Sale occurred and when Circles closed.  In a letter to her creditors dated March 25, 2011, the Debtor's lawyer described the sale as having taken place "throughout the Fall of 2010."  (Ex. P-1 at 49).  The exact dates of the sale and the closure of the business are not material to the inquiry under §523(a)(6).

27.   The Liquidation Sale generated $21,519.00 in proceeds ("the Sale Proceeds").  (Ex. P-1 at 49).

28.   The Sale Proceeds in the Third Federal Account were not commingled with funds from any other source.  (N.T. 9:22:22).

29.   Approximately $18,000.00 of inventory remained unsold after the Liquidation Sale.  ( N.T. 10:03:50).

30.   Thereafter, Debtor did not sell the remaining inventory because she was told "not to touch it" by her lawyer, Joseph McGinley ("McGinley").  (N.T. 10:23:30).[8]

### The Disposition of the Sale Proceeds

31.   On March 25, 2011, McGinley wrote to the Debtor's creditors, advising them of the existence of the $21,519.00 Sale Proceeds and proposing a global settlement.  The proposal did not accord any preference on account of Plaintiff's secured position.  (Ex. P-1 at 49-50).[9]

---

[8]      Through the date of trial, the unsold inventory has been stored in a storage facility in Doylestown.  (N.T. 10:23:30).

[9]      In the March 25, 2011 letter, McGinley classified the creditors as follows:

| | |
|---|---|
| trade debt | $ 4,532.62 |
| personal lenders | 14,947.00 |
| landlord; Comcast | 9,738.37 |
| business seller (i.e., Plaintiff) | 42,726.00 |

McGinley proposed to use the Sale Proceeds to pay all creditors, other than the Plaintiff, 50% of their respective claims, leaving "$6,911, plus the unsold inventory" for the Plaintiff.  Presumably, McGinley believed that the value of the inventory would result in the Plaintiff, too, receiving about 50% of her claim.

(continued...)

32. The Plaintiff rejected the Debtor's offer to settle the outstanding balance on the Note.  (N.T.

    10:06:50).

33. On September 12, 2011, the Plaintiff entered a judgment by confession against the Debtor

    for non-payment under the Secured Promissory Note in the Pennsylvania Court of Common

    Pleas, Bucks County ("the CCP").[10]  (Ex. P-1 at 52-65).

34. On September 15, 2011, the Debtor withdrew the entire balance from the Third Federal

    Account in the amount of $20,842.25.  (Ex. D-1; N.T. 9:32:00).[11]  She retained the funds in

    cash at her home.  (N.T. 9:41:05).

35. The Debtor used the money that she withdrew from the Third Federal Account to pay

    herself unpaid salary for the years that she had not taken a salary from Circles.  (N.T.

    9:34:04, 9:50:30).[12]

---

[9](...continued)
        In the March 25, 2011 letter, McGinley also stated that : (1) that he had previously
communicated with the Plaintiff's attorney Michael Brooks; and (2) "[s]everal creditors" asserted that
they held "UCC liens."

[10]     The record was not developed as to when the Debtor defaulted under the Note.

[11]     A review of the bank statements suggests that the Debtor drew down on the Third
Federal Account to pay the storage fees for the unpaid inventory.

[12]     The Debtor testified that she was "given" the money by her legal counsel as unpaid
salary.

        Q:    Why was the account closed Sept 15, 2011?

        A:    It was closed because I needed money to live off so it was given to me as
              back wages for like a year and a half.

        Q:    And who was it given to you by?

                                                                    (continued...)

36.    After withdrawing the funds from the Third Federal Account, the Debtor did not use any of

the Sale Proceeds to repay the Debtor's obligations under the Note.[13]  Instead, she used the

cash to pay for her own personal living expenses[14] and legal fees.  (N.T. 9:40:10).

37.    The Debtor exhausted the funds a few months after the §341 Meeting of Creditors was held

in her chapter 7 bankruptcy case.  (N.T. 10:04:55).

38.    The Debtor was aware of the confessed judgment against her and Circles when she

withdrew the money from the segregated account.  (N.T. 9:24:25).

39.     The Debtor also was aware that her conduct would cause injury to the Plaintiff's property

rights when she withdrew the money from the segregated account to use for her own

---

[12](...continued)
                        A:      It was from legal counsel.

(N.T. 9:34:04).

            Because the Debtor testified unequivocally that she deposited and withdrew the funds
from the Third Federal Bank account and there is no evidence that McGinley was ever in possession of
the Sale Proceeds, I infer from the phraseology of the Debtor's testimony (i.e., that she was "given" the
money) that McGinley told her that she could apply the funds towards her unpaid salary.

[13]        The Debtor testified that she may have paid something to the Plaintiff from the Sale
Proceeds.  (N.T. at 9:38:36).  The bank records do not reflect any withdrawal from the account that
corresponds to the monthly payment under the Note.  (See Ex. D-1).  Further, the Debtor acknowledges
that after she withdrew the funds on September 15, 2011, she did not remit any portion of the Sale
Proceeds to satisfy her obligations to the Plaintiff.  (N.T. 9:39:00).

[14]        The Debtor spent the money on inter alia, food, rent, and other necessities, student loans
and purchasing a motor vehicle.  (See Ex. D-2).

benefit.[15]

## IV.  DISCHARGEABILITY UNDER 11 U.S.C. §523

Generally speaking, the Bankruptcy Code seeks to promote two important policy

interests: "to give the debtor a new financial start and to keep creditors on an equal playing

field."  In re Calabrese, 689 F.3d 312, 320 (3d Cir. 2012).  To achieve the objective of a fresh

start, the Bankruptcy Code provides debtors a discharge of their prepetition debts.

Congress recognized, however, that the policy had to yield in some respects, to balance

between the competing interests of debtors and creditors.  The discharge is therefore, not

absolute.  The statutory exceptions to discharge are found in §523(a).  These exceptions are

construed strictly against creditors and liberally in favor of debtors.  E.g., In re Cohn, 54 F.3d

1108, 1113 (3d Cir. 1995); In re Vidal, 2012 WL 3907847, *15 (Bankr. E.D. Pa. Sept. 7, 2012).

A creditor objecting to the dischargeability of a debt bears the burden of proof.  Cohn, 54 F.3d at

1113; In re Bittar, 2012 WL 1605160, *2 (Bankr. D.N.J. May 8, 2012).  The creditor must

establish the nondischargeability of the debt by a preponderance of the evidence.  Grogan v.

Garner, 498 U.S. 279, 291 (1991); In re August, 448 B.R. 331, 357 (Bankr. E.D. Pa. 2011)

(citations omitted).

Section 523(a)(6) specifically excepts from discharge any debt for "willful and malicious

injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §523(a)(6).

To invoke the 523(a)(6) exception, the creditor must prove not only that injury has resulted, but

---

[15]      This is a critical finding in this proceeding and its basis is discussed in Part VI.B.1.,
infra.

also that the debtor's conduct was both "willful" and "malicious."  E.g., In re Vepuri, 2009 WL

2921305, at *8 (Bankr. E.D. Pa. Mar. 25, 2009).

A "willful" injury is an injury that is done deliberately or intentionally.  In re Coley, 433

B.R. 476, 497 (Bankr. E.D. Pa. 2010) (citing Kawaauhau v. Geiger, 523 U.S. 57, 61 (U.S.

1998)).  In Geiger, the Supreme Court clarified that §523(a)(6) does not encompass reckless acts

that lead to injury:

> The word "willful" in (a)(6) modifies the word "injury," indicating that
> nondischargeability takes a deliberate or intentional injury, not merely a
> deliberate or intentional act that leads to injury. Had Congress meant to
> exempt debts resulting from unintentionally inflicted injuries, it might
> have described instead "willful acts that cause injury." Or, Congress might
> have selected an additional word or words, i.e., "reckless" or "negligent,"
> to modify "injury." . . . [T]he (a)(6) formulation triggers in the lawyer's
> mind the category "intentional torts," as distinguished from negligent or
> reckless torts. Intentional torts generally require that the actor intend "the
> consequences of an act," not simply "the act itself."

523 U.S. at 61-62.

In the Third Circuit, "actions taken for the specific purpose of causing an injury as well as

actions that have a substantial certainty of producing injury are 'willful' within the meaning of

§523(a)(6)."  Coley, 433 B.R. at 497 (citing Conte, 33 F.3d at 307-09)).[16]

---

[16]     Unresolved, however, is the question whether actions that have a "substantial certainty of
producing injury" are measured subjectively or objectively.  See In re Connor, 302 B.R. 509, 514 (Bankr.
W.D. Pa. 2003) (dictum).  The use of a subjective standard, as opposed to an objective standard, may
materially effect the outcome of a dischargeability proceeding.  If measured subjectively, the creditor
bears the burden of proving that the debtor was aware that the injury was a substantially certain
consequence of his or her intended action.  An objective standard is less rigorous, requiring a showing
that a reasonable person would have known that his or her deliberate actions would have resulted in a
substantially certain injury.

        Several courts in this circuit have held that the subjective standard is applicable under
the reasoning of Conte.  See In re Gotwald, 488 B.R. 854, 866 (Bankr. E.D. Pa. 2013) (collecting cases).

"Malice" is distinct from willfulness. The commonly-accepted definition of malice encompasses an injury that is "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will."  In re Jacobs, 381 B.R. 128, 138-39 (Bankr. E.D. Pa. 2008); 4 Collier on Bankruptcy ¶ 523.12[2] (Alan N. Resnick and Henry J. Sommer eds., 16th ed. 2013). A plaintiff is not required to prove that the debtor acted with "specific malice."  Conte, 33 F.3d at 308 (quoting St. Paul Fire & Marine Ins. Co. v. Vaughn, 779 F.2d 1003, 1009 (4th Cir. 1985)). In a §523(a)(6) proceeding, a debtor may act with malice without bearing any subjective ill will toward the plaintiff/creditor or any specific intent to injure the same.  In re Wooten, 423 B.R. 108,130 (Bankr. E.D. Va. 2010); In re Davis, 262 B.R. 663, 670-71 (Bankr. E.D. Va. 2001)).

## V.  CONTENTIONS OF THE PARTIES

The Plaintiff's theory of the case is straightforward.  The Plaintiff held a security interest in all of Circles' assets.  According to the Plaintiff, without the Plaintiff's permission and with full knowledge and understanding of the Security Agreement, the Debtor disposed of business collateral by withdrawing the Sale Proceeds from the Third Federal Account and spending the money on personal living expenses, thereby destroying the Plaintiff's property interest in the Sale Proceeds.

The Debtor spins a more innocent version of the events.  She acknowledges that she deposited the Sale Proceeds into a separate account and that later, just a few days after the confession of judgment was filed, she withdrew the funds and used them for her own benefit. However, the Debtor contends that she paid a lawful and valid claim to a creditor – outstanding salary to herself.  The Debtor's argument can be distilled into two (2) distinct contentions: (1) the

13

dissipation of the Sale Proceeds was not conversion, and (2) even if it were conversion, it was

merely a technical conversion because preferring one creditor over another does not rise to the

level of a willful and malicious injury.[17]

I will address the issues in the order presented by the Debtor.


# IV.  DISCUSSION

## A.  The Debtor's Conduct Was Malicious Within the Meaning of §523(a)(6)

### 1.

As stated earlier, under 11 U.S.C. §523(a)(6), the element of maliciousness refers

primarily to the wrongfulness of the conduct.

In this proceeding, I find that the Plaintiff has met her burden of proving that the Sale

Proceeds of the Liquidation Sale were subject to the Security Agreement, and the terms of the

Security Agreement restricted the Debtor from disposing of those proceeds without the prior

written consent of the Plaintiff.  Therefore, I conclude that the Debtor's appropriation and

dissipation of the Sale Proceeds caused a "malicious" injury to the Plaintiff's property, within the

meaning of 11 U.S.C. §523(a)(6).

---

[17]       In an argument that appears related to the second argument summarized above in the
text, the Debtor suggests that this dispute would not exist if the Debtor had continued to pay herself a
salary while she was liquidating the inventory.  (Def.'s Mem. at 4).  The fact that she had the practical
ability to do earlier what she did later does not help her cause.  The propriety of paying her own
compensation at a time when Circles was operating in the ordinary course and the Plaintiff was
consenting to the use of the proceeds of the collateral for ordinary business expenses (or was otherwise
waiving her rights under the security agreement), see Finding of Fact No. 21 & n.5, supra, is entirely
distinct from the use of the segregated proceeds from a going-out-of business sale to pay her own
compensation after Circles was no longer operating.  See Part IV.A.3, infra.

**2.**

The uncontradicted evidence presented at trial established that the Debtor granted the

Plaintiff a security interest in the assets of Circles as collateral for repayment of the Note.  The

Security Agreement defined the Collateral to include "proceeds . . . of any of the foregoing,

including, but not limited to . . . any and all . . . inventory. . . ."  (Ex. P-1 at 33).  Further, the

Agreement incorporated the definition of "proceeds" under the Pa. UCC, which is defined as

"[w]hatever is acquired upon the sale, lease, license, exchange or other disposition of collateral."

13 Pa.C.S. §9102.   The Pa. UCC automatically grants a security interest in the identifiable

proceeds of any collateral that has been sold.  See 13 Pa.C.S. §9315(a)(2) ("a security interest

attaches to any identifiable proceeds of collateral").

The Debtor testified that as she liquidated the inventory of Circles she deposited the

money into a separate account at Third Federal Bank.  The funds derived from the Liquidation

Sale were proceeds of the Collateral.  The Sale Proceeds therefore, were identifiable and

governed by the Security Agreement and, as a secured creditor, the Plaintiff had a property

interest in the Sale Proceeds.

**3.**

The next question is whether the Debtor wrongfully converted the Sale Proceeds under

the terms of the Security Agreement.

The terms of the Security Agreement restricted the Debtor from disposing of the

Collateral without the advance written permission of the Plaintiff.  Paragraph 3(b) of the Security

Agreement provided that the Debtor "shall not sell, lease or otherwise dispose of the Collateral."

15

Oddly, there is no qualification to this provision even though the Collateral includes Circles'

inventory, an item, especially in the retail industry, that changes and fluctuates on a daily basis as

it is bought by and sold to consumers.

The Debtor operated Circles for approximately two (2) years after she acquired the

business, selling inventory in the ordinary course of business.  Given the unqualified scope of

¶3(b) of the Security Agreement, the Debtor arguably violated the provision each time she sold

inventory without the prior written consent of the Plaintiff.  However, there is no evidence to

suggest that the Plaintiff notified the Debtor that she was in violation of the Security Agreement

for selling inventory in the ordinary course of business and likely acquiesced to this practice.

Therefore, it is reasonable to conclude that the parties intended an exception to the ¶3(b)

restriction, i.e., that the Debtor could use, sell, and dispose of inventory without prior written

consent if the disposition was in the ordinary course of business.  This is consistent with case law

that a secured party with a security interest in the inventory of a retail seller is presumed to have

authorized the sale of the inventory to purchasers.[18]

Other indicia in record tend to suggest that the parties did not intend a flat prohibition on

all sales of inventory.  For example, the stated intention in the BPA – that the Debtor was

---

[18]    See In re Darling's Homes, Inc., 46 B.R. 370 (Bankr. D. Del. 1985); see also, McFadden
v. Mercantile-Sale Deposit & Trust Co., 260 Md. 601, 616-17 (Md. 1971) ("When credit is extended
against the security of inventory, the lender knows or should know that the borrower usually
contemplates selling the encumbered goods in order to raise money to repay the loan" (citation omitted));
see also New Moon Shipping Co. v. MAN B&W Diesel AG, 121 F.3d 24 (2d Cir. 1997) ("Evidence of a
prior course of dealing may establish a party's awareness of and consent to intended contractual terms");
Faulkner v. Nat'l Geographic Soc'y, 452 F. Supp. 2d 369, 381 (S.D.N.Y. 2006) ("[C]ourse of dealing
throughout the life of a contract is highly relevant to determining the meaning of the terms of the
agreement"); Restatement (Second) of Contracts §§ 223(1), (2) (noting that parties' course of dealing
over the duration of the agreement can vary or supplement contractual terms).

purchasing Circles to run it as her own business – certainly implies that it was within the contemplation of the parties that the Debtor would sell the inventory.  Similarly, the inclusion of a provision creating a floating lien on inventory in the Security Agreement, likewise hints that Circles' inventory would be turned over and replaced.  (See Ex. P-1 at 33) ("present and future inventory . . . including goods held for sale or lease").

However, there is no reason to believe that the Debtor's authority to sell inventory without prior approval extended to out of the ordinary course of business transactions, such as a going-out-of-business sale.  And, even if it did, such authority could not extend to disposition of the proceeds of the sale (which was Plaintiff's collateral) without the Plaintiff's consent.  Such a result would be completely at odds with the purpose of the Security Agreement.

Therefore, once Circles ceased operations, the Debtor was required to obtain the Plaintiff's written consent to dispose of the collateral.  This obligation to obtain the Plaintiff's consent encompassed the use of the Sale Proceeds to pay herself the alleged overdue salary.

## 4.

A security interest in collateral may be the subject of an action for conversion.  Chrysler Credit Corp. v. Smith, 643 A.2d 1098, 1100 (Pa. Super. Ct. 1994).  "When a debtor disposes of collateral which has been subjected to a perfected security interest, the secured party may bring an action against the debtor on the original debt or to collect the proceeds from a sale of the collateral, or he may proceed against the transferee of the collateral in replevin or in trespass for conversion."  Id. (citing First Pennsylvania Banking & Trust Co. v. Liberati, 422 A.2d 1074, 1077 (1980)).

Pennsylvania law[19] defines the tort of conversion as "the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without lawful justification." In re Hyland, 2000 WL 1210822, at *6 (Bankr. E.D. Pa. Aug. 17, 2000) (internal citations omitted); accord Carter v. Morrison, 2010 WL 701799, at *19 (E.D. Pa. Feb. 24, 2010). "A plaintiff has a cause of action in conversion if he or she had actual or constructive possession of a chattel or an immediate right to possession of a chattel at the time of the alleged conversion." Chrysler Credit Corp, 643 A.2d at 1100.

When the Debtor utilized the Sale Proceeds to pay an alleged unsecured debt to herself (in the form of back salary), she deprived the Plaintiff of her right to the collateral. The transaction was without legal justification and constituted a conversion of the Plaintiff's security interest. The Debtor's conduct was wrongful and therefore, malicious within the meaning of 11 U.S.C. §523(a)(6).

## B. The Debtor's Actions Were Willful under §523(a)(6)

### 1.

As the Supreme Court cautioned in the seminal case of Davis v. Aetna Acceptance Co., not every act of conversion is assumed to be willful and malicious:

> There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception. . . . But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may

---

[19]    The BPA, the Note, and the Security Agreement all provide that the governing law is Pennsylvania law.

18

> be an honest, but mistaken belief, engendered by a course of dealing, that powers
> have been enlarged or incapacities removed. In these and like cases, what is done
> is a tort, but not a willful and malicious one.

293 U.S. 328, 332 (1934) (citations omitted).

As another court has explained,

> if the conversion of collateral is done through an honest but erroneous belief there
> is authority to sell or dispose of collateral and use the proceeds, even if such
> conduct can be viewed as negligent, unreasonable or reckless, the resultant
> liability to the secured creditor is dischargeable under § 523(a)(6) because the
> requisite intent to cause injury is lacking.

In re Armstrong, 2006 WL 2850527, at *11 (Bankr. D. Idaho Oct. 3, 2006).[20]

To determine whether there has been a wilful and malicious injury in collateral

conversion cases, the court must analyze each set of circumstances on a case-by-case basis and

determine whether the conversion is in the nature of an intentional tort or whether the conversion

is the result of a negligent or reckless tort.  Coley, 433 B.R. at 501; see also In re Whiters, 337

B.R. 326, 345 (Bankr. N.D. Ind. 2006); In re Kidd, 219 B.R. 278, 284 (Bankr. D. Mont. 1998).


**2.**

Under Conte, voluntary, deliberate actions that are substantially certain to cause injury are

"willful" within the meaning of 11 U.S.C. §523(a)(6).  That standard has been satisfied here.

The Debtor acknowledged that she was aware of the Security Agreement and testified that

---

[20]      For example, if a debtor misappropriates a lender's collateral in an attempt to keep the
business operating as a going concern with the expectation that the debt secured by the collateral will be
repaid, a court may find that the debtor's conversion was not wilful and malicious.  See e.g., In re
Phillips, 882 F.2d 302, 305 (8th Cir. 1989); In re Long, 774 F.2d 875, 882 (8th Cir. 1985); Bittar, 2012 WL
1605160, at *4; In re Ricci, 2003 WL 25932297, *6 (Bankr. S.D. Iowa Aug. 27, 2003); In re Crump, 247
B.R. 1, 5 (Bankr. W.D. Ky. 2000).

she understood its meaning.  At minimum, she understood that the Plaintiff had rights in the

collateral that she had some duty to preserve.  Indeed, the Debtor went to some expense, all the

way through the trial date, to store and preserve the unsold inventory that continues to constitute

the Plaintiff's collateral.  While the record is less explicit whether she understood that any duty

she may have had to preserve the business inventory also required her to preserve the Plaintiff's

security interest in the proceeds of the inventory (i.e., the Sale Proceeds), I find, by a

preponderance of the evidence, that she did.  I reach this conclusion for several reasons.

First, if the Debtor understood that the Plaintiff was secured by the collateral, it is more

likely than not that she also understood that the Plaintiff was secured by the Sale Proceeds

generated by the collateral.  This may not be invariably true for every person who grants a

creditor a security interest in personal property.  But in this proceeding, the Debtor testified that

she read and understood the Security Agreement.  I will grant that this testimony was curt and

general.  Significantly, however, she did not testify or present any evidence that she did not

understand that the Plaintiff's lien extended to the Sale Proceeds generated by the sale of the

inventory.  Given her testimony that she read and understood the Security Agreement, she had

the burden of producing contrary evidence on the issue.

Second, her segregation of the Sale Proceeds in a separate bank account demonstrates an

awareness that she did not have the right to commingle the funds with her own personal assets or

withdraw the funds for her own benefit and to the detriment of Circles' creditors.  This

supports the inference that she was aware that other creditors had an interest in the proceeds from

the inventory.  From there, it is not a great leap to conclude that she understood that creditors

with "liens" on the original collateral  – which she knew included the Plaintiff –  had the

20

strongest claim to fund.  Again, given her testimony regarding her knowledge and understanding

of the Security Agreement, that is the most natural inference to draw and the Debtor presented no

evidence to the contrary.

Third, even if I were to assume that, at the time she was depositing the Sale Proceeds into

the Third Federal Account, and segregating those funds, she did not fully understand the

Plaintiff's prime position in Sale Proceeds, that could no longer have been true months later

when she committed the injurious act  – the withdrawal of the money from the account for her

own benefit, purportedly as back salary.  The March 25, 2011 letter the Debtor's counsel, Joseph

McGinley, sent to Circles' creditors supports this conclusion.  See Findings of Fact No. 31 & n.9,

supra.

In the March 25, 2011 letter, McGinley stated that he had previously communicated with

the Plaintiff's attorney Michael Brooks; he also stated in the letter that  "[s]everal creditors"

asserted that they held "UCC liens."  Based on his communication with Brooks, McGinley

undoubtedly was aware of the existence of the Plaintiff's security interest in the business assets

and inventory.  Since it is fair to assume that McGinley discussed with the Debtor the nature of

the competing claims of her creditors and her options in proposing a global settlement before

sending the letter to the creditors, it is also fair to infer that the Debtor was aware of the

Plaintiff's preferred position in the Sale Proceeds.[21]  Yet, the Debtor presented no evidence to

---

[21]      In light of McGinley's awareness of the claims of certain creditors (including the
Plaintiff) that they held liens, one might then wonder why he would propose a pro rata distribution
among all creditors.  But there is a plausible explanation.  A fair reading of McGinley's letter suggests
that he was trying to convince all the creditors (including the putative secured creditors) to give up some
of their legal rights in the exercise of their business judgment.  While the March 25, 2011 letter does not
address separately why the putative secured creditors should give up the benefit of their liens, it does

(continued...)

explain why she thought payment of an unsecured claim (her back salary) could be squared with the Plaintiff's lien position in the Sale Proceeds.

Finally, when considering whether the Debtor's actions were "willful" within the meaning of §523(a)(6), I cannot overlook the timing of the Debtor's withdrawal of the funds from the Third Federal Account. It cannot be mere coincidence that just a scant three (3) days after the Plaintiff confessed judgment against her, the Debtor withdrew all of the Sale Proceeds, treating those funds as unpaid back salary owed from many months earlier. Prior to the confession of judgment, the Debtor preserved the Third Federal Account virtually untouched for months. See n.11, supra. The Debtor appropriated the entire account for her own benefit just as the Plaintiff was taking legal steps to realize the proceeds of the inventory collateral.

The timing certainly suggests an awareness that the Debtor was placing her own interests ahead of the Plaintiff's. Given my prior conclusion that the Debtor understood that the Plaintiff had a security interest in the Sale Proceeds, the Debtor also must have understood that her actions were both contrary to the Plaintiff's rights in the Sale Proceeds and would necessarily cause

---

[21](...continued)
dangle before all of the creditors the potential benefits achieved by the avoidance of a bankruptcy filing by the Debtor. McGinley maintained (accurately or not) that the administrative expenses of a bankruptcy filing would both delay and reduce the ultimate payment that creditors might receive. Perhaps McGinley's failure to address why a bankruptcy filing would negatively impact secured creditors explains why the Plaintiff rejected his proposal.

In any event, the key point here is that nothing in McGinley's letter suggests that he (and by extension, the Debtor) believed that the Sale Proceeds were unencumbered funds. McGinley was aware that the Plaintiff claimed a lien position in the segregated Sale Proceeds. And, again, the Debtor did not develop any evidence to suggest that she was unaware of this fact that was known to her lawyer or that she disputed the validity of the lien or the Plaintiff's senior rights in the funds.

injury to those rights.[22]

------

[22]      I am aware of the Debtor's testimony that she was "given" the money by her counsel.
See n.12, supra.  Interpreting this testimony liberally in the Debtor's favor, she may have been suggesting
that McGinley advised her that she had the right to take the Sale Proceeds for her own benefit, ahead of
the Plaintiff's claim to the fund.  If so, this "reliance on advice of counsel" testimony would suggest that
the Debtor lacked a subjective awareness that her conduct was wrongful and would cause injury to the
Plaintiff, thereby potentially negating the scienter requirement under 11 U.S.C. §523(a)(6).

> As I recently explained in Gotwald,

>> "Advice of counsel" is not really a "defense" in a §523(a)(6) proceeding in the
>> sense of being an affirmative defense.  Rather, it is a species of evidence that is
>> offered to negate the requisite element of intent under §523(a)(6).

>> In the last analysis, the issue is whether adding the alleged reliance on counsel . .
>> . leaves the trier of fact unable to conclude by a preponderance of the evidence
>> that the debtor acted with the requisite intent.

>> The burden of production of evidence in support of the "defense" rests with the
>> debtor.  However, the ultimate burden of persuasion with respect to the elements
>> of a nondischargeability claim under §523(a)(6) remains with the plaintiff at all
>> times.

>> [T]he primary elements of the "defense" are:

>>> (1) did counsel give the advice;

>>> (2) was the advice "legal" advice;

>>> (3) did the debtor rely upon the advice of counsel;

>>> (4) while acting in good faith.

488 B.R. at 872-73 (internal citations and footnote omitted).

> The Debtor did not sufficiently develop the record to support this defense.

> There is no evidence regarding her discussions with McGinley to negate the evidence
that she understood that the Plaintiff held a lien on the proceeds and that her appropriation of the Sale
Proceeds would injure the Plaintiff's property.  Other than testifying that she was given the money by
counsel (which I have interpreted to mean that counsel told her that she was a creditor of Circles and
therefore, could take the Sale Proceeds for herself), the Debtor did not provide any details regarding the
advice that she was given.  Nor did she harmonize her asserted right to dispose of the Sale Proceeds with
her simultaneous reliance on legal advice that she could not dispose of the unsold inventory.  If she could
pay herself the Sale Proceeds, why did she have to continue to store the inventory, rather than selling it to

                                                                                      (continued...)

Thus, the Debtor's conduct satisfies the Conte definition of willfulness: deliberate action that the debtor subjectively understood was substantially certain to cause injury to the plaintiff.

## C.  Amount of the Nondischargeable Debt

The final issue is the amount of the debt that is excepted from discharge in the Debtor's chapter 7 bankruptcy case.

In her post-trial memorandum, the Plaintiff suggests that the confessed judgment should be determined to be nondischargeable and directs the court to consider cases from outside of this district that hold the full amount of the debt to be nondischargeable.  The Debtor argues that none of the debt is nondischargeable, but if the court were to hold otherwise, she contends the amount is limited to the converted proceeds less expenses for the Debtor's attorney's fees of $4,000.00 and the costs of storage of the inventory of $1,900.00.

I find that the nondischargeable debt is the converted amount of the Sale Proceeds – not the full amount of the Note.  See Ricci, 2003 WL 25932297, at *8 ("[R]ecovery cannot exceed the value of the security interest in the collateral or the value of the collateral at the time of the conversion").  Only those debts that arise out of the same course of conduct that caused the injury are nondischargeable.  See In re Kates, 485 B.R. 86, 111-12 (Bankr. E.D. Pa. 2012) (collecting cases).

---

[22](...continued)
pay her creditors?  Her bare bones testimony on the subject is inadequate.

As in Gotwald, given the evidence presented from which it is fair to infer the Debtor's "willfulness," and absent further details regarding McGinley's legal advice, I am unable to find that the advice caused the Debtor to lack the requisite scienter for a willful and malicious injury.

24

The Plaintiff presented no evidence that the original debt itself was created through a willful and malicious injury or that the Debtor acted willfully and maliciously when she breached her obligation to repay the Note.  Rather, the conduct that created a debt for willful and malicious injury was the diversion of the proceeds of the sale of the Plaintiff's collateral.

As for the Debtor's fees and costs, it is unclear what the underlying rationale is for the $4,000.00 in attorney's fees to be excluded from the nondischargeable debt.  There is no basis in the Bankruptcy Code to exclude the Debtor's attorney's fees when calculating the amount of the nondischargeable debt.  The same is true for the costs the Debtor incurred in storing the inventory.

For these reasons, I find that the Sale Proceeds in the amount of $20,842.25 were converted as a result of the Debtor's willful and malicious conduct and that the Plaintiff's claim in that amount is nondischargeable under §523(a)(6).

## VI.  CONCLUSION

For the reasons set forth above, I will enter an order determining that the Debtor's debt to the Plaintiff is nondischargeable in the amount of  $20,842.25.

Date:  June 19, 2013

_____
**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**